**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | MDL No. 2:18-mn-2873-RMG<br><br>**This Document Relates to** *City of Millington v. 3M Company et al*, **2:20-cv-01034-RMG** |

CITY OF MILLINGTON and NATIONAL RURAL
WATER ASSOCIATION, individually and on behalf of
all others similarly situated,

        *Plaintiffs,*

       *-vs-*

THE 3M COMPANY, f/k/a Minnesota Mining and
Manufacturing Co., AGC CHEMICALS AMERICAS
INC., AMEREX CORPORATION, ARKEMA INC.,
individually and as successor in interest to Atofina S.A.,
ARCHROMA MANAGEMENT LLC, BASF
CORPORATION, individually and as successor in interest
to Ciba Inc., BUCKEYE FIRE EQUIPMENT
COMPANY, CARRIER GLOBAL CORPORATION,
individually and as successor in interest to Kidde-Fenwal,
Inc., CHEMDESIGN PRODUCTS INC., CHEMGUARD
INC. CHEMICALS, INC., CLARIANT CORPORATION,
individually and as successor in interest to Sandoz
Chemical Corporation, CORTEVA, INC., individually and
as successor in interest to DuPont Chemical Solutions
Enterprise, DEEPWATER CHEMICALS, INC.,
DUPONT DE NEMOURS INC., individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, DYNAX CORPORATION, E. I. DUPONT
DE NEMOURS AND COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, KIDDE-FENWAL, INC., individually and as
successor in interest to Kidde Fire Fighting, Inc., NATION
FORD CHEMICAL COMPANY, NATIONAL FOAM,
INC., THE CHEMOURS COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, THE CHEMOURS COMPANY FC, LLC,

**FIRST AMENDED
COMPLAINT**

**Jury Trial Demanded**

| | |
|---|---|
| individually and as successor in interest to DuPont Chemical Solutions Enterprise, and TYCO FIRE PRODUCTS, LP, individually and as successor in interest to The Ansul Company, | ) ) ) ) ) |
| *Defendants.* | ) ) ) |

Plaintiffs the City of Millington and the National Rural Water Association (collectively "Plaintiffs"), by and through their attorneys Napoli Shkolnik PLLC, for their First Amended Complaint against Defendants 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., AGC CHEMICALS AMERICAS INC., AMEREX CORPORATION, ARKEMA INC., ARCHROMA MANAGEMENT LLC, BASF CORPORATION, BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER GLOBAL CORPORATION, CHEMDESIGN PRODUCTS INC., CHEMGUARD INC. CHEMICALS, INC., CLARIANT CORPORATION, CORTEVA, INC., DEEPWATER CHEMICALS, INC., DUPONT DE NEMOURS INC., DYNAX CORPORATION, E. I. DUPONT DE NEMOURS AND COMPANY, KIDDE-FENWAL, INC., NATIONAL FOAM, INC., NATION FORD CHEMICAL COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, and TYCO FIRE PRODUCTS LP (collectively "Defendants") allege on behalf of themselves and others similarly situated as follows:

## **INTRODUCTION AND BACKGROUND**

1.     This is a class action lawsuit brought by Plaintiffs on behalf of the City of Millington and other similarly situated public water providers supported by the National Rural Water Association (collectively the "Class Members") for injunctive and equitable relief arising from Defendants' widespread contamination of public water supplies with per- and polyfluoroalkyl substances (collectively "PFAS"). This relief is necessary to determine the extent

of the contamination of Plaintiffs' public water supplies caused and/or created by Defendants' products and to protect the public health, safety, welfare, and the environment.

2.    PFAS were an integral part of aqueous film-forming foam ("AFFF") that was used for decades during operations and fire training sessions at military and civilian airports throughout the country.

3.    Defendants manufactured, marketed, and/or sold aqueous film-forming foam ("AFFF"), and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluorinated chemicals ("PFCs") contained in AFFF (collectively, "AFFF/Component Products"), that was used at military and civilian airports throughout the United States.

4.    Defendants were aware that PFAS chemicals are toxic to animals and humans, do not biodegrade, are persistent in the environment, move easily through soil and groundwater, and pose a significant risk to the environment and human health. Nevertheless, they elected to manufacture, market, and sell these chemicals, placing profits over human health and the environment.

5.    Defendants designed, manufactured, marketed, and sold their products with knowledge that large quantities of PFAS would be stored, used, and maintained in such a manner that these toxic chemicals would be released into the environment and contaminate the air, soil, and groundwater.

6.    The Class Members are public water providers who own and operate at least one drinking water well situated in close proximity to a site where AFFF products containing PFAS were purchased, consumed, used, utilized, mixed, stored, handled, transported, discharged, released and/or disposed of.

7.     On information and belief, PFAS leached into the air, soil, and groundwater at and surrounding these sites as a result, contaminating the environment and poisoning the groundwater in and around the sites.

8.     On information and belief, a substantial likelihood exists that the resulting PFAS contamination has impacted the Class Members' public water supply wells.  Thus, the only way for the Class Members to ensure their drinking water is safe is to perform testing to determine if their wells are contaminated with PFAS.

9.     The Class Members do not possess the resources necessary to test and determine if their drinking water wells are contaminated with PFAS.  As a result, they have no way of knowing whether they are endangering the health of their citizens by providing drinking water contaminated with PFAS.

10.     Plaintiffs contend that Defendants' choice to use these harmful chemicals and failure to warn of their dangers, given their early knowledge of PFAS risks, was wrongful, and that it should be Defendants—not the Class Members—that should be required to pay for future testing.

11.     Plaintiffs seek mandatory injunctive and equitable relief to compel Defendant to fully investigate and provide information to Class Members about the extent of any existing PFAS contamination through a court-supervised drinking water well testing program.  There is no regulatory scheme whereby groundwater must be tested for PFAS simply because Plaintiff is concerned of inevitable contamination of emerging contaminants.  Thus, a successful outcome in this case is the Class Members' only means of obtaining the critical testing needed to prevent potential future harm to their citizens.

12.     Plaintiffs also seek to recover damages already incurred and/or that will be incurred by Class Members in investigating, monitoring, remediating, and otherwise responding to potential contamination of their water supplies as a result of Defendants' conduct.

## PARTIES

**Plaintiffs**

13.     The City of Millington is located in Shelby County, Tennessee, and provides drinking water intended for human consumption to residents inside the city's boundaries.

14.     The City of Millington owns property with six water wells within six miles of Millington Regional Jetport, a Certified Part 139 Airport.  Four of those wells are operated at a depth of 1,400 feet as part of the Fort Pillow Aquifer, with two of the wells producing approximately 1,200 gallons of water per minute each and the other two producing approximately 900 gallons per minute.  The remaining two wells are operated at a depth of 500 feet as part of the Memphis Sand Aquifer, with one well producing approximately 650 gallons of water per minute and the other producing approximately 800 gallons per minute.  The Memphis Sand Aquifer wells are used as stand-by wells while the Fort Pillow Aquifer wells are the main wells for the city.

15.     The National Rural Water Association ("NRWA") is a "non-profit organization dedicated to training, supporting, and promoting the water and wastewater professionals that serve small communities across the United States.  The mission of NRWA is to strengthen State Associations."[1]

16.     NRWA provides "training and technical assistance through 49 affiliated State Rural Water Associations, that currently have over 31,000 utility system members."[2]  Last year, staff from these state associations "delivered over 75,000 on-site technical assistance visits and 150,000

---

[1] NRWA, Our Association, https://nrwa.org/about-us/about-our-association (last visited Feb. 22, 2020).
[2] *Id.*

hours of training to more than 37,000 utilities."[3]  This training and technical assistance "covers every aspect of operating, managing and financing water and wastewater utilities."[4]

17.    NRWA provides training and technical assistance to any eligible water and wastewater systems, regardless of membership.  NRWA programs generally focus on assisting small and rural communities that serve less than 10,000 people.

18.    NRWA also provides small and rural water suppliers with access to low-cost loans, mass-notification software, cyber-security insurance, and web-hosting services, among other products and services.

**Defendants**

19.    The term "Defendants" refers to all Defendants named herein jointly and severally.

The AFFF Defendants

20.    The term "AFFF Defendants" refers collectively to Defendants 3M Company, Amerex Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Chemguard Inc., Kidde-Fenwal, Inc., National Foam, Inc., and Tyco Fire Products L.P.

21.    Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

22.    Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

---

[3] *Id.*
[4] *Id.*

23.     Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

24.     Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

25.     In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFFProducts in Europe.

26.     On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

27.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

28.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

29.     Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

30.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including but not limited to PFOA and PFOS.

31.     Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.

32.     On information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

33.     On information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.

34.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

35.     On information and belief, Buckeye designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

36.     Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

37.     Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

38.     On information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

39.     On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC,

Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

40.    On information and belief, Chubb was acquired by Williams Holdings in 1997.

41.    On information and belief, Angus Fire Armour Corporation had previously been acquired by Williams Holdings in 1994.

42.    On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

43.    On information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

44.    On information and belief, Kidde P.L.C. was acquired by United Technologies Corporation in or around 2005.

45.    On information and belief, Angus Fire Armour Corporation and National Foam businesses separated from United Technologies Corporation in or around June 2013.

46.    Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

47.    On information and belief, Kidde-Fenwal was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies Corporation.

48.    On information and belief, Kidde-Fenwal is the entity that in June 2013 divested the AFFF business unit now operated by National Foam.

49.    Defendant Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

50.    On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later.  On information and belief, Carrier became successor in interest to Kidde-Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde-Fenwal's design, manufacture, marketing, distribution, and sale of AFFF.

51.    On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF containing PFOS, PFOA, and/or their chemical precursors that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Millington Regional Jetport.

### The Fluorosurfactant Defendants

52.    The term "Fluorosurfactant Defendants" refers collectively to Defendants 3M, Arkema Inc., ChemDesign Products Incorporated, Chemguard Inc., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours Inc., and Dynax Corporation.

53.    Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

54.    On information and belief, beginning sometime in the early 1970s, the French chemical company Atochem designed, manufactured, marketed, distributed, and sold

fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

55.    On information and belief, when Atochem's parent company, Elf-Acquitaine, merged with TotalFina in 1999 to form TotalFinaElf, the two companies' combined their chemical operations to create Atofina S.A. ("Atofina").  On information and belief, Atofina continued to design, manufacture, market, distribute, and sell fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

56.    On information and belief, Atofina sold its fluorosurfactant business to Dupont Chemical Solutions Enterprise in September 2002.

57.    On information and belief, Arkema was created in October 2004 when TotalFinaElf spun off Atofina.  On information and belief, Arkema is the successor in interest to Atofina and is legally responsible for the liabilities arising from the manufacture of fluorosurfactants used in AFFF by Atofina and its predecessors before September 2002.

58.    Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

59.    On information and belief, BASF is the successor-in-interest to Ciba. Inc. (f/k/a Ciba Specialty Chemicals Corporation).

60.    On information and belief, Ciba Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

61.    Defendant ChemDesign Products Inc. ("ChemDesign") is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143.

62.    On information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

63.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

64.    On information and belief, Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

65.    Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

66.    On information and belief, Dynax entered into the AFFF products market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

67.    On information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

68.     Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

69.     Defendant The Chemours Company ("Chemours Co.") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899.

70.     In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFOS and PFOA and fluorosurfactants.  On information and belief, Chemours Co. has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products.

71.     On information and belief, Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015.  From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

72.     In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly-traded company.

73.     Defendant The Chemours Company FC, LLC ("Chemours FC") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware, 19899.

74.     Defendant Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

75.     Defendant Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

76.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

77.     Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

78.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

79.     Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

80.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

81. Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

82. On information and belief, DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

83. On information and belief, 3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

84. On information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Millington Regional Jetport.

<u>The PFC Defendants</u>

85. The term "PFC Defendants" refers collectively to 3M, AGC Chemicals Americas Inc., Archroma Management LLC, ChemDesign Products Inc., Chemicals, Inc., Clariant Corporation, Deepwater Chemicals, Inc., E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., DuPont de Nemours Inc., and Nation Ford Chemical Company.

86. Defendant AGC Chemicals Americas, Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

87.    On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its a principal place of business in Tokyo, Japan.

88.    AGC manufactures specialty chemicals.  It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

89.    On information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

90.    Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

91.    On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").  On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

92.    On information and belief, Clariant designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

93.    Defendant Archroma Management LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its a principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

94.     On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

95.     On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

96.     Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

97.     On information and belief, Chemicals, Inc. supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

98.     Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

99.     On information and belief, Nation Ford supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

100.     On information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

101.     On information and belief, the PFC Defendants supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in

AFFF/Component Products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Peterson Air Force Base and the Colorado Springs Municipal Airport, which share one property.

102.    Defendants represent all or substantially all of the market for AFFF/Component Products at Millington Regional Jetport.

## JURISDICTION AND VENUE

103.    For this Court to have subject matter jurisdiction, Plaintiffs must have standing under Article III of the U.S. Constitution to assert the claims underlying this lawsuit.

104.    To establish standing under Article III, Plaintiffs must show (1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision.

105.    An organizational plaintiff like the NRWA has standing when it has suffered injury-in-fact, such as the frustration of its mission and diversion of its resources.

106.    The contamination caused by Defendants undermines NRWA's organizational activities, causes a drain on their resources, and requires them to divert resources from other programs they could be funding to assist water providers in furtherance of their overall missions.  Such a  concrete and demonstrable disruption to  NRWA's activities,  along  with  the corresponding  drain  on  its  resources,  constitutes  far  more  than  simply  a  setback  to the organization's abstract social interests.

107.    As a result of Defendants' conduct, the NRWA will be forced to divert significant resources from the training, assistance, and services it normally provides in order to test and remediate groundwater contamination on behalf of the Class Members.  Thus, the NRWA's ability

to fulfill its mission of strengthening State Associations by providing training and assistance to its members will be diminished.

108.    The City of Millington and the other Class Members have been injured by the PFAS contamination of their public water wells and/or threat, anticipation, and reasonable expectation or fear of such contamination, both of which restrict the Class Members' enjoyment and use of their respective water supplies.

109.    The injuries described above are actual, concrete injuries suffered by Plaintiffs and the other Class Members.  These injuries have been caused by Defendants' tortious conduct as alleged herein.

110.    The relief sought herein would redress the injuries suffered by Plaintiffs and the other Class Members by providing the critical testing needed to prevent potential future harm to their citizens.  Plaintiffs also have no other adequate remedy at law, making the relief sought herein necessary and appropriate.

111.    Having established Article III standing, this Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 (a) because the parties are diverse and the amount in controversy exceeds $75,000.

112.    For purposes of the claims alleged in this Complaint, the District of Tennessee shall be the home venue, defined as the proper venue of origin where the claim could have otherwise been brought pursuant to 28 U.S.C. § 1391.

## GENERAL FACTUAL ALLEGATIONS

**PFOA and PFOS and Their Risk to Public Health and the Environment**

113.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial

products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

114.    The two most widely studied types of these substances are perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonate ("PFOS"), which each contain eight carbon atoms.

115.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

116.    PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

117.    PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

118.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

119.    PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant

periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

120.    PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

121.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

122.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

123.    PFAS are readily absorbed after consumption or inhalation, and accumulate primarily in the blood stream, kidney, and liver.

**Defendants' Development of PFAS**

124.    In the 1940's, 3M Company began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFAS.

125.    3M Company soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M Company to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotch Gard, which contained PFAS and when applied to fabric, furniture, and carpets protected against liquids and stains.

126.    Upon information and belief, by at least the 1970s, 3M Company knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

127.    In 1975, 3M Company concluded that PFOS was present in the blood of the general population. Since PFOS is not naturally occurring, this finding should have alerted 3M Company to the possibility that their products were a source of these chemicals. The finding also should have

alerted 3M Company that PFOS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics explain the absorption of PFOS in blood after contact with 3M's products.

128.    Upon information and belief, 3M Company concealed this knowledge from the public and government regulators its knowledge of the risk of harm posed by PFOS.

129.    In 1976, 3M Company found PFOA in the blood of its workers. This finding should have alerted 3M Company to the same issues raised by the findings regarding PFOS in the prior year.

130.    A 1978 study by 3M Company showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies by 3M Company in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

131.    Studies by 3M Company after the 1970s also showed adverse effects from exposure to PFOA and PFOS. In a 1983 study, for example, 3M Company found that PFOS caused the growth of cancerous tumors in rats.

132.    A study proposal by 3M Company in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

133.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M Company listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M Company and DuPont" as support for this statement.

On information and belief, 3M's MSDS's for AFFF, which contained PFOA, did not provide similar warnings.

134.    In an attempt to limit liability, 3M Company opted to stop producing PFAS in 2002 because it was aware of the looming chemical exposure and health effects on the public.

135.    Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

136.    3M Company did not comply with its duty under TSCA, and, in April 2006, it agreed to pay EPA a penalty of more than $1.5 million for, among other things, its failure to disclose studies regarding PFAS dating back decades.

137.    DuPont also did not comply with its duty under TSCA and the Resource Conservation and Recovery Act (RCRA), and, in 2005, agreed to pay $10.25 million, the largest civil administrative penalty that EPA had ever obtained to that date under any federal statute. The TSCA violations of Section 8(e) specifically addressed the company's failure to report to EPA the substantial risks of PFOA.

**Defendants' Manufacture and Sale of AFFF/Component Products Despite Known Risks**

138.     In 1951, 3M Company began selling its PFAS to other chemical companies, including DuPont.

139.    Other companies, including Defendants, began manufacturing AFFF using PFAS that they produced themselves or purchased from other companies.

140.    Defendants voluntarily elected to include PFAS in their AFFF.

141.    Defendants knew or should have known that PFAS are highly soluble in water, extremely mobile, persistent, and very likely to contaminate drinking water wells and present significant risks to human health and welfare if released into the environment.

142.    Nevertheless, Defendants manufactured, marketed, and sold their AFFF/Component Products with the knowledge that PFAS would be released into the environment in firefighting training and rescue exercises, inadvertent releases, as well as in emergencies.

143.    Upon information and belief, instructions, labels and material safety data sheets for AFFF/Component Products provided by Defendants did not, for significant time periods, fully describe the health and environmental hazards of AFFF/Component Products, which Defendants knew or should have known at the time of distribution.

144.    Upon information and belief, Defendants knew of these health and environmental hazards for years, yet failed to warn the users and other sensitive receptors, such as public water providers.

145.    AFFF concentrate containing PFAS forms foam when it is mixed with water and ejected from a nozzle. That foam is then sprayed so that it coats the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

146.    Civilian and military airports, fire departments and industrial facilities, unaware of the environmental and health risk and hazards of using Defendants' AFFF/Component Products, used AFFF containing PFAS for decades for firefighting and training.

147.    These sites have been linked to the widespread contamination of surface and groundwater, as well as public drinking water wells throughout the country with PFAS.

148.    On information and belief, all Defendants knew or should have known that in its intended and/or common use, AFFF containing PFAS would very likely injure and/or threaten public health and the environment.

149.    On information and belief, this knowledge was accessible to all Defendants. For example, in 1970 a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS.  On information and belief, at least the following Defendants are and/or were members of this trade association: 3M Company, Tyco/Ansul, Chemguard, and National Foam/Angus.

150.    Additionally, on information and belief, all Defendants knew or should have known that their AFFF/Component Products and the PFAS the products contained, easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and tend to bioaccumulate, because studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population were publicly available beginning in, at least, 1976.

151.    In or about 1977, Tyco/Ansul was also aware of the environmental and toxic concerns of its AFFF and undertook a study and investigation on more environmentally improved AFFF.

152.    There is no natural sink for AFFF/Compound Products containing PFAS.  Except for incineration above 10,000 degrees, Defendants' PFAS will eventually accumulate in the water and all living organisms - including the blood and organs of humans and livestock.

153.    Plumes of PFAS can persist in underground aquifers for many decades. Once the plume reaches a well, it continues to contaminate the water drawn from that well.

**AFFF/Component Products Containing PFAS Are Fungible and Commingled in the Groundwater**

154.    Once it has been released into the environment and groundwater, AFFF containing PFAS, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF/Component Products.

155.    The process of manufacture and distribution of AFFF/Component Products, including that which contains PFAS, sometimes includes complex arrangements whereby Defendants sell product for delivery through specific military bases and/or third-party logistic intermediaries throughout the country.

156.    A subsurface plume, even if it comes from a single location, such as a retention fire training area, most likely originates from mixed batches of AFFF/Component Products containing PFAS coming from different manufacturers.

157.    Because precise identification of the specific manufacturer of any given AFFF/Component Product that was the source of PFAS in the groundwater is impossible, Plaintiffs and the other Class Members must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiff.

158.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, to profit from the use of AFFF/Component Products containing PFAS, at Plaintiff's expense, and to attempt to avoid liability for their contamination of the groundwater.

**Evolving Understanding of Health Hazards and Levels of Acceptable Exposure to PFAS**

159.    As discussed above, none of the Defendants complied with their obligations to notify the EPA about the "substantial risk of injury to health or the environment" posed by their PFAS products. *See* TSCA § 8(e).

26

160.    In or around 1998, EPA began investigating the safety of PFAS after some limited disclosures by 3M Company and others.

161.    PFAS have been found to bioaccumulate in humans and animals. In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

162.    Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the EPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95% no later than 2010.

163.    The recommendations in the EPA's health advisories evolved as they learned more about the dangers and toxicity of PFAS.

164.    On January 8, 2009, the EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively.[5]

165.    Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

166.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer,

---

[5] U.S. Environmental Protection Agency, Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS) (Jan. 8, 2009), at 1 n.1, *available at* https://www.epa.gov/sites/production/files/2015-09/documents/pfoa-pfos-provisional.pdf.

ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

167.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

168.    The injuries caused by PFAS can arise months or years after exposure.

169.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

170.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

171.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or

risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

172.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[6]

173.    On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt (parts per trillion). *See* Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33, 250-51 (May 25, 2016).

174.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA[7] and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

**Sources of PFAS Contamination**

175.    Under 14 C.F.R. Part 139, the Federal Aviation Authority ("FAA") is required to issue airport operating certificates to airports that (1) serve scheduled and unscheduled air carrier aircraft with more than 30 seats; (2) serve scheduled air carrier operations in aircraft with more

---

[6] Blum et al.,*The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environmental Health Perspectives*, 123(5) Envtl. Health Perspectives A107–A111 (2015), *available at* http://dx.doi.org/10.1289/ehp.1509934.
[7] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

than 9 seats but less than 31 seats; and (3) the FAA Administrator requires to have a certificate. In order to be certified as a Part 139 Airport, an airport is required to store AFFF onsite and maintain aircraft firefighting vehicles capable of utilizing AFFF.

176.    Certified Part 139 airports, military installations, and fire training centers used AFFF containing PFAS for decades, unaware of the environmental and health hazards.  These sites have been linked to widespread PFAS contamination of surface water, groundwater, and drinking water wells throughout the country.

177.    Testing required by the Third Unregulated Contaminant Monitoring Rule showed far-reaching PFAS contamination surrounding Certified Part 139 airports, military installations, and fire training centers, sometimes as far as 12 miles away.  DoD testing has also confirmed the spreading of PFAS contamination from military installations to drinking water wells.

178.    Industrial use of PFAS is also a potential source of contamination.  Such contamination is typically associated with a specific facility, for example, an industrial facility where PFAS was produced or used to manufacture other products, or an oil refinery or airfield.

## CLASS ACTION ALLEGATIONS

179.    Plaintiffs reallege and incorporate Paragraphs 1–160 above as if fully set forth herein.

180.    Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all others similarly situated as members of a proposed class ("the Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

181.    The Class consists of any public water provider that:

    a.    is a member of a State Rural Water Association affiliated with NRWA;

      b.  owns and operates one or more drinking water wells located within six (6) miles of a:

          i.  current military installation;

          ii.  decommissioned military installation;

         iii.  Certified Section 139 Airport; or

         iv.  firefighting training facility; and

      c.  has not had the well or wells tested for the presence of PFAS contamination in the  10 years preceding the filing of this Complaint.

182.    The proposed Class includes the City of Millington and otherwise consists of members whose interests are germane to the NRWA's purpose in training, supporting, and promoting water providers that serve small communities across the United States.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements.

183.    Specifically excluded from the Class are:

      a.  Defendants, including any entity or division in which a Defendant has a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

      b.  the Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

      c.  class counsel and all firm members, employees, and their immediate family members; and

      d.  individuals with private wells that are contaminated with PFAS.

184.    Plaintiffs reserve the right to amend the definition of the proposed Class if discovery and further investigation reveal that it should be expanded, divided into additional subclasses, or modified in any other way.

### Numerosity

185.    The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class Members is not yet known, Plaintiffs contend, on

information and belief, that there are likely to be hundreds, all of whom will be ascertainable from publicly available information and documents produced during discovery.

## Typicality

186.    Plaintiffs and the other Class Members each and all have tangible and legally protectable interests at stake in this action.

187.    Plaintiffs' claims and those of the other Class Members have a common origin and share a common basis.  Like the proposed Class, Plaintiffs either own and operate or support the interests of those that own and operate drinking water wells in small communities threatened by PFAS contamination.  And like the proposed Class, Plaintiffs have been injured as a result of the substantial financial burden associated with testing and potentially remediating that contamination. These injuries were all caused by the same wrongful and tortious conduct undertaken by Defendants, who have acted in the same way towards Plaintiffs as they have the other Class Members.

## Commonality

188.    The questions of law and fact common to the Class Members include:

a.    Whether and when the various Defendants manufactured, marketed, and/or sold AFFF/Component Products containing PFAS;

b.    Whether Defendants owed a duty to Class Members to refrain from the conduct that led to the contamination of the Class Members' drinking water wells with PFAS;

c.    Whether there is sufficient evidence that Defendants' AFFF/Component Products pose a risk of harm to the environment;

d.    Whether Defendants should have known that their AFFF/Component Products posed a risk of harm to the environment;

e.    The extent to which Defendants became aware that their AFFF/Component Products posed a risk of harm to the environment;

f.    Whether there is sufficient evidence that Defendants' AFFF/Component Products pose a risk of harm to human health;

g. Whether Defendants should have known that their AFFF/Component Products posed a risk of harm to human health;

h. The extent to which Defendants became aware that their AFFF/Component Products posed a risk of harm to human health;

i. Whether Defendants provided adequate warnings about the potential harms associated with their AFFF/Component Products;

j. Whether Defendants provided adequate instructions for the use of their AFFF/Component Products;

k. Whether Defendants provided adequate instructions for the disposal of waste generated by their AFFF/Component Products;

l. Whether Defendants made misleading representations or omissions with respect to the environmental and health effects of PFAS;

m. Whether Defendants' AFFF/Component Products were defectively designed;

n. Whether Defendants are strictly liable to Class Members for failure to warn about the environmental and health risks posed by their AFFF/Component Products; and

o. Whether Plaintiffs and the Class are entitled to injunctive relief.

189. These questions of law and fact that are common to Plaintiffs and the other Class Members predominate over any questions affecting them individually.

## Adequate Representation

190. Plaintiffs will fairly and adequately represent the interests of the members of the class as required by Fed. R. Civ. P. 23(a)(4). Plaintiff's claims are typical of the claims of the Class and they have no interests that are adverse to the interests of the Class Members. Plaintiffs have retained competent legal counsel experienced in litigation of class action, consumer, and environmental tort litigation.

## Rule 23(b)(1)(A) and (B)

191. The prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to certain members that would, as a practical matter, be dispositive of the interests of other members of the proposed Class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

192.     The prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants.

**Rule 23(b)(2)**

193.     Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief with respect to the entire Class appropriate.

**Rule 23(b)(3)(2)**

194.     The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.  Given the number of Class Members impacted by Defendants' conduct that will require testing and possible remediation, it is impracticable for Plaintiffs and the other Class Members to individually litigate their respective claims due to the risk of inconsistent judgments and the increased expense to both the parties and the court system.  Absent a class action, most Class Members would likely find the cost of litigating their claims to be prohibitively expensive and would continue to suffer injury as a result of their inability to test their drinking water wells for PFAS contamination .

195.     Class treatment of the common questions of law and fact outlined above will conserve judicial resources and promote consistent adjudication of the Class Members' claims.

**COUNT I**
**STRICT LIABILITY – DESIGN DEFECT AND/OR DEFECTIVE PRODUCT**

196.     Plaintiffs reallege and incorporate Paragraphs 1–177 above as if fully set forth herein.

197.     As a commercial designer, manufacturer, distributor, supplier, seller, and/or marketer of AFFF/Component Products containing PFAS, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

34

198.    Defendants    breached    that    duty    by    marketing    inherently    defective AFFF/Component Products containing PFAS.

199.    Defendants knew that third parties would purchase AFFF/Component Products containing PFAS and use it without inspection for defects.

200.    Defendants knew at the time of manufacture that their chosen formulations of AFFF/Component Products, all of which which included PFAS, was not biodegradable and bioaccumulated in fish, wildlife, and humans.

201.    The AFFF/Component Products manufactured, marketed, and/or sold by Defendants were purchased by third parties who used them in a reasonably foreseeable manner and without substantial change in their condition.

202.    Defendants knew or should have known that the use of AFFF/Component Products containing PFAS by these third parties would result in the spillage, discharge, disposal, or release of AFFF/Component Products onto land or into groundwater supplies.

203.    The AFFF/Component Products manufactured, marketed, and/or sold by Defendants that were used in the vicinity of the Class Members' drinking water wells were defective in design and unreasonably dangerous because, among other things:

   a.  AFFF/Component Products containing PFAS cause extensive and persistent contamination of groundwater when used in its foreseeable and intended manner.

   b.  PFAS contamination in drinking water poses significant risks to public health and welfare.

   c.  Defendant failed to conduct and/or disclose adequate scientific studies to evaluate the impact of PFAS contamination on the environment and human health.

204.    At all times relevant to this action, AFFF/Component Products containing PFAS were dangerous to an extent beyond that contemplated by the ordinary consumer and posed a

foreseeable risk of harm that outweighed the cost to Defendants of measures designed to mitigate that risk.

205.    Defendant knew or should have known about feasible alternatives to its AFFF/Component Products that did not contain PFAS, and the omission of those alternative designs rendered their AFFF/Component Products defective.

206.    As a direct and proximate result of these defects, the Class Members have suffered significant injury due to the likelihood that their drinking water wells are now contaminated by PFAS.

207.    Upon information and belief, Defendant knew or should have known that their products would result in injury to the Plaintiffs and the Class and/or their drinking water wells.

208.    Defendant is liable for all such injury, and Plaintiffs are entitled to the injunctive relief they seek on behalf of themselves and the other Class Members.

## COUNT II
## STRICT LIABILITY- FAILURE TO WARN

209.    Plaintiffs reallege and incorporate Paragraphs 1–190 above as if fully set forth herein.

210.    Defendants had strict duties not to manufacture, sell, and distribute products without adequate warnings about latent dangers they knew or should have known about resulting from the foreseeable use and storage of their products.

211.    Defendants breached those duties by failing to warn about the latent dangers to drinking water wells posed by using and storing AFFF/Component Products containing PFAS. Defendants knew or should have known that such dangers would result from the foreseeable use and storage of their AFFF/Component Products but failed to warn about the existence and nature of those latent dangers, their magnitude, and how to minimize or prevent them.

212.    As a proximate result of Defendants' manufacture, marketing, and sale of PFAS and AFFF/Component Products containing PFAS without adequate warnings about the latent dangers they posed, these products were purchased or otherwise acquired, stored, and used at Certified Part 139 Airports, military installations, and fire training facilities in a foreseeable manner that resulted in avoidable contamination of the drinking water wells.

213.    Defendants knew or should have known that their products would result in substantial damage to the Class Members' drinking water wells.

214.    Defendant's conduct involved actual malice and/or a wanton, willful, and reckless disregard for the health, safety, property, and rights of others.

## COUNT III
## NEGLIGENCE

215.    Plaintiffs reallege and incorporate Paragraphs 1–196 above as if fully set forth herein.

216.    As a commercial manufacturer, seller, distributor, supplier, marketer, and/or designer of PFAS and AFFF/Component Products containing PFAS, Defendant owed a duty of care to Plaintiffs and the other Class Members not to place into the stream of commerce a product that was in a defective condition and unreasonably dangerous to drinking water wells.

217.    Defendants breached this duty by negligently designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing unreasonably dangerous products into the stream of commerce even when they knew or should have known about the dangers PFAS and AFFF/Component Products containing PFAS posed to drinking water wells.

218.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and the other Class Members have incurred and will continue to incur damages due to the PFAS contamination caused by Defendants' AFFF/Component Products.

219.    Defendants knew or should have known that the acts and omissions described above would cause injury by contaminating drinking water wells.

220.    Defendants' conduct involved actual malice and/or a wanton, willful, and reckless disregard for the health, safety, property, and rights of others.

## COUNT IV
## PUBLIC NUISANCE

221.    Plaintiffs reallege and incorporate Paragraphs 1–202 above as if fully set forth herein.

222.    The use of AFFF/Component Products containing PFAS at Certified Part 139 Airports, military installations, and fire training facilities has contaminated drinking water wells, thus causing a public nuisance.

223.    Defendants participated in the creation and/or maintenance of this public nuisance by, among other things, manufacturing, marketing, and selling inherently defective AFFF/Component Products without adequate product instructions or warnings about the risks they posed to drinking water wells.

224.    Defendants are liable to Plaintiffs and the other Class Members for the costs of court-supervised testing of their water wells that will reveal the location and extent of any groundwater contamination.

225.    Defendants knew or should have known that the foreseeable use and storage of their AFFF/Component Products would result in a public nuisance.

226.     Defendants' conduct involved actual malice and/or a wanton, willful, and reckless disregard for the health, safety, property, and rights of others.

## COUNT V
## TRESPASS

227.     Plaintiffs reallege and incorporate Paragraphs 1–208 above as if fully set forth herein.

228.     Defendants' intentional acts and/or omissions caused PFAS to be distributed to Part 139 Airports, military installations, and fire training centers, thereby increasing the risk it would enter and contaminate the Class Members' drinking water wells.

229.     Defendants' intentional acts and omissions caused PFAS to enter and trespass upon the property of Class Members without consent, resulting in a non-permissive entry into the Class Members' drinking water wells.

230.     Upon information and belief, Defendants affirmatively, voluntarily, and intentionally failed to act in a manner that would have prevented the migration of PFAS into the Class Members' drinking water wells.

231.     At the time of these acts and omissions, Defendant knew or should have reasonably known that PFAS would contaminate the Class Members' drinking water wells.

232.     Defendants' intentional actions and omissions resulted in the immediate and continued trespass, injury, and damage to the Class Members' drinking water wells.

233.     As a direct result of Defendants' trespass, Plaintiffs and the others Class Members have suffered damages, including but not limited to expenditures on treatment systems and modifications to the water supply system, engineering and sampling costs, and current and future outlays for the maintenance of the treatment system.

## DAMAGES SOUGHT BY THE CLASS

234.   Plaintiffs reallege and incorporate Paragraphs 1–207 above as if fully set forth herein.

235.   Plaintiffs seek mandatory injunctive relief on behalf of all Class members in the form of a court-supervised testing program that will provide information to Class Members about the extent of any PFAS contamination in their drinking water wells.  Plaintiffs also seek a court-supervised program of notice to protect the class.  Data obtained from drinking water well testing should be collected and recorded in a centralized electronic database that can be used to map PFAS contamination in groundwater, thereby providing further relief in the form education and research.

236.   A court-supervised testing program will provide relief to Class Members and contribute to the protection of groundwater resources and the advancement of water quality awareness in three important ways.  First, testing data will give notice and warning to all public water providers who own and operate drinking water wells that, unbeknownst to them, are currently contaminated.  Second, the availability of data on the locations of PFAS plumes will also alert other owners and operators of drinking water wells about nearby groundwater hazards, allowing them to make informed choices about water sources.  Third, the database developed through the program will provide researchers with information concerning the current status and vulnerability of groundwater resources to one of the most pervasive man-made contaminants in history.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs, on behalf of themselves and others similarly situated, demand judgment against Defendant and request the following relief from the Court:

A. An order certifying the proposed Class and appointing the Representative Plaintiffs and their Counsel to represent the Class;

B.  Injunctive and equitable relief on behalf of the proposed Class that includes:

i.  A court-supervised testing program;

ii.  A court-supervised data collection program;

iii.  A court-supervised program of notice to affected drinking water well owners;

C.  An order for an award of attorney fees and costs, as provided by law;

D.  An order for all such other relief the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated:    September 25, 2020

Respectfully Submitted,

**NAPOLI SHKOLNIK, PLLC**

By: /s/ Paul J. Napoli, Esq.
Paul J. Napoli, Esq.
Andrew W. Croner, Esq.
Michelle Greene, Esq.
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
pnapoli@nsprlaw.com
acroner@napolilaw.com
mgreene@napolilaw.com